Case number 17-3784, U.S.A. v. Oscar Collado-Rivera Argument not to exceed 15 minutes per side. Mr. Rager, you may proceed for the appellant. Good morning, Your Honor. I'd like to reserve two minutes for rebuttal. You may, and you may proceed. Thank you. May it please the Court, the opposing counsel. I represent Mr. Oscar Collado-Rivera. I'm going to refer to him as Mr. Collado just for simplicity's sake today. He was initially indicted for conspiracy to distribute cocaine. He went to trial and was eventually convicted. Today I want to focus on four issues for the Court. Two of them deal with pre-trial issues, and the other two deal with sentencing issues. The first two pre-trials, the motion to suppress and the first motion to withdraw. The other sentencing issues is the second motion to withdraw by his counsel, and also the failure of the District Court to allow him to make two additional objections to the pre-sentence trial. Can you keep your voice up? I'm sorry? Can you keep your voice up, please? I'm sorry. Let me get a little closer here. Mr. Collado, let's start with the motion to suppress. First off, I want to note for the Court that his house was raided by SWAT, a local SWAT team, and the only people who testified at the suppression hearing that knew what happened inside that house were Mr. Collado and his girlfriend, Louise Guzman. The testifying officers here at the time didn't know why SWAT had acted the way they did, did not go in there, didn't even bother to get a report. So I think that the evidence established, and this is a factual-driven argument on the motion to suppress, is that December 15th at 6 a.m., it was 35 degrees outside before dawn, Mr. Collado, Louisa, and her brother were awoken, not by a knock on the door, not by a bullhorn, but by when their front door was being busted open. They go down to the second floor, and they see several armed, masked individuals with assault rifles pointing at them, saying, get down. They get down. Now, Louisa testified at the suppression hearing. So your argument is that the way they conducted the search or whatever essentially was coercive in terms of the confession later? Yes, and I think it's actually fair. Was there enough time that passed between the two events that we can just say, or the district court said, right, that it wasn't the passage of time basically cured any problem that there would have been? I disagree with that because I believe that there was a continuing show of force. And what we've got to note here is that what happened, just real quickly, and I'll answer that question, is when everybody was tied up, the SWAT team went upstairs for unexplicable reason, which even the district court said this was inappropriate and unnecessary, and it was especially alarmed. They blew out the third floor windows, causing $3,000 worth of damage. Okay, so we go off from that, and a man is sitting in his underwear in the cold, and that is when the filing officer comes in. Now, I know we have a time period between when Mr. Collado was arrested and when he had to be in court at 11 a.m. that morning. So all this took place within a matter of hours. He goes from seeing his girlfriend crying and her brother crying, being dragged around, their furniture being busted up. He gets kicked in the back of the head when he asks what's going on here and told to shut the F up. He then is approached by the detective, and the detective finally goes into the house and tries to convince him to start speaking to him. He says things like, you know, first one to talk, first one to walk, and, you know, you're facing a lot of time, help yourself out. I'm not concerned with that. I think that's fairly standard. But what happened here is this officer made a show of calling the prosecutor, the United States attorney, on the phone and saying, I talked with the prosecutor and he wants to sit down and talk with you immediately. And, by the way, this is going to be confidential. Now, I know there's going to be an argument that the Miranda rights, which were eventually given to him, sort of go against that confidentiality. But one of the important things about that statement is, and I think this is common sense, is that if you're going to say we're going to keep quiet in a large drug conspiracy case, that your co-defendants aren't going to know this. In his case, that promise was broken when they said at the detention hearing that it was the co-defendants that he had talked to. Then we go to the DEA. He's finally given some clothes. We go to the DEA. He's processed. And then he's surrounded by four or five officers. And I do admit that he was given his Miranda rights to the extent that he was given a piece of paper, didn't get a chance to read it, because everybody in there is saying we only have so much time because we've got to be in court. We've got to be in court. Apparently this was a situation where the district court had prearranged the initial appearance. And it was either now or never with Mr. Collado because the officers involved knew that once he went to court, he would be appointed attorney and the procedure was they would have no contact with him. Well, the prosecutor didn't show up to this. And what we have is he's surrounded there, and one of the officers, after about 10 minutes, and this is a whirlwind interrogation. It lasted 15 minutes. Apparently during the first 10 minutes of this, they didn't like what he had to say. One of the officers slams a table with his hand or his fist, calls Mr. Collado a liar, and says this is BS, gets up, and with a continuing show of force, slams his chair against the table and leaves. And then apparently Mr. Collado confesses to his whole involvement in this conspiracy within 5 minutes. Now the district court held a hearing and went through the Binford analysis. And the first thing in that analysis was this police force of activity. And I say that it was. When you had your house busted into in the morning, busted up for no apparent reason, you're in your underwear, it's cold, you're worried about your girlfriend, and there was a threat about possibly arresting the girlfriend, then worried about her being in a home that has no windows and freezing and everything like this. Then to be taken to the DEA office, which Mr. Collado never had any experience whatsoever with criminal law. And he's given, and his native language is Spanish. He wasn't given the Miranda rights in Spanish. He wasn't given an opportunity to read them, but he did sign them. And he would say, I was doing whatever I was told at that point. Now the court sidesteps a lot of the other factors in the Binford, which is essentially, was this a crucial motivating factor or would this overbear a defendant's will? And the court made a statement in his opinion, or its opinion, that there was no evidence that this motivated any of Mr. Collado's statements. That is just incorrect based on the record. Is that a factual finding? I would say, yes, it is a factual finding. So we would be that for clear error, right? Yes. I don't disagree with that. But when we look at the record, it is replete with Mr. Collado saying, I was scared. I was scared. By the time I asked, I was doing what I was told. It's replete with him saying twice, I wanted to remain silent, but I kept on being reminded what I was told at the scene of his house, after that show of force. And when it comes to the confidentiality, which the court found, that that wasn't enough because they didn't find evidence. But what we see when we look at that record, Mr. Collado said, when they came out to speak to me again, I refused to speak to them because they had lied to me. They told me this was going to be confidential. And then they went ahead and blurted it out in front of my co-defendants at a detention unit, in front of other people that, you know, really could put me in a lot of danger. He did have to be separated. And I do not think that the reading of the Miranda rights in this situation miraculously erases that atmosphere. I think it's one factor of the totality of the circumstances, yes. But when you look at this situation and what he went through in this whirlwind interrogation, you know, where he's being forced into court, a completely hostile alien environment. And like I said in the United States v. Brown, the interrogation came on the heels of his arrest. He was in a hostile alien environment with neither friend nor foe. And we're talking about going straight from a violent raid, interrogation surrounded by five people, with at least one of them slamming the table and barging out and calling him more names, to going to court for the first time in this man's life. I think, you know, we do see some cases about the length of interrogation, how long it goes. And this situation is a little reversed. I think in this situation things went so fast that the violence was so critical that this man would have never had any experience. He really was doing what he was told. So I think under the totality of the circumstances, this should have been suppressed. My second free trial issue is the motion to withdraw vice counsel. Two months before trial, in this case, Mr. Collado instructed his attorney to file a motion to withdraw. And I believe in both motions to withdraw, the attorney agreed these are circumstances where substitution should be had. So Mr. Collado files that motion. But instead of having a hearing on his motion, a month later, the court holds a laughter hearing. And I have two distinct problems with that procedure. First off, when we look at the actual transcript of that laughter hearing, what we see there is the district court crossing the line into pre-trial negotiations. This was not just the thing of, all right, this is what you're facing if you get convicted, and this is what's been offered. We told you this. You can read that transcript. It first starts out and says, Mr. Collado, the purpose of this hearing is to save you from yourself. Later on, the purpose of this hearing is to show you what kind of mistake you're making. And this was before you can go in to end these problems. And the court had a letter from Mr. Collado. And it said I would read it to the record. But it never did, and it never entered that letter to the record concerning the problems with his attorney. Under U.S.B. Jennings. But he gave him an open-ended opportunity to come back if they couldn't resolve it, and he never came back. This is the issue with that, Your Honor, that I believe is pretty crucial. Keep your voice up, okay? Oh, I'm sorry. This is the issue that I think is pretty crucial here, Your Honor, is I do not believe it was proper for that district court to kick the can down the road in this situation. Because after going through, and I agree, there was some discussion there. We don't know if the court covered all of the problems in the letter, because we just don't know. But there was some discussion there where Mr. Collado had problems with communication, about process, about legal meaning, terms of legal meanings, continuance, discovery issues. Apparently, he was upset that for months there was a motion pending for discovery on a dirty FBI agent who was involved in his case. He wanted to take his case in a different direction, his attorney. But what's key is at the end of that hearing, I believe the court makes a finding that the relationship was irretrievably broken. You can read that. Now, Mr. Collado, if you still believe your relationship with your attorney is irretrievably broken, I might consider doing this stuff. He says, I will consider. What's that? He says, I will consider. Yeah, he says, I will consider. Not might. I mean, he says, I will consider. I mean, if he had gone back to him, he would have considered it, right? I'd have to look at whether he said will. I mean, I'll grant he said that. But when somebody on a court believes that there's an irretrievably broken down relationship, it is right then and there that he should have substituted counsel. But where did the court say you have an irretrievably broken relationship? He said to the defendant, if you believe that, right? No, if you still believe that. Right, if you still believe. That doesn't, if I say to you, well, if you still believe that after you have this conversation come back, I'm not saying I believe it. I'm saying, I'm acknowledging that you believe it. But what we don't have there, I think, is the analysis under Mac and Ivers, and a true inquiry into these problems. I think what we have in there, and this is on a lackluster hearing, if you read between the lines, I think the real purpose of that was to convince Mr. Colano just to plead, and put the attorney issue down the road. I really do. It wasn't about Mr. Colano's issues with his attorney. But he gave him the opportunity to come back and he didn't. I agree with that. He did not come back. But what I'm saying is when there is a belief, where the court makes the finding of it's me that believes it or you believe it, when there is that breakdown, communication between attorney and client, I've been doing CJA stuff for 15 years. If I can't communicate with my client, I can't put an effective defense. I mean, I can do what I think is right, but I need that person to talk to me, to trust me, not to be always thinking I'm doing something else or doing something for the government or like that. I need that person to be able to say, this is what happened, Jeff, and this is what I think we should do. What do you think? Your time has expired. Would you take a moment to address the second motion to withdraw as counsel? Whether that was an abuse of discretion on the district court's part in denying that? Right. We have a bit of deja vu here in the second motion. This comes after the trial. And it came about two months before the sentencing. And it was when it was filed. And then at sentencing, Mr. Collado actually had to remind the court about the motion. And then as an afterthought, the court said one word, overruled. And that's it. Now, Mr. Collado had tried to say his problems, and he actually did, eventually, along the way. He was doing his allocution. But what we hear from the court is, let's do this. Let's let the court of appeals deal with the whole thing. I want to sentence you. And honestly, I think in this situation, and under due process, the district court's job is to deal with the whole thing and not to put it in this court's lap. I think he should have listened to Mr. Collado, should have gone through the reasons of why, and made a finding of, now I don't accept that, I do accept that, but he just did not do that. And what do you think that this court should do with regard to that ruling by the district court? I think he needs, well, two things. One is I think it needs to be remanded for a new sentencing. And the other reason I say it needs to be remanded for a new sentencing is because he stood up and wanted to raise two objections because his attorney said, we were only able to communicate these two objections to each other. Is there a prejudice requirement? Do you have to show he was prejudiced because he didn't have the attorney that he wanted? If nothing happened, what would have happened if he didn't have a new attorney? What would have happened if he didn't have an attorney? If he had gotten another attorney. Personally, I think half of the issues in this appeal would be here. And I know a lot of times when I sentence the second one, were there sentencing objections that he wanted to make that the attorney didn't make? Is that an argument? Yes, Your Honor. But the judge said you can give me those objections, right? That's when the court cut him off and said, let's save this for later. But didn't he try to re-argue the counsel issue as opposed to giving the sentencing objections that he wanted? The transcript basically went like this. It is, Your Honor, I have two objections, but I really want to be heard on a fair representation of counsel. I think it's exactly what he said. And he started to go into that, and that's when the court said, let's do this. I don't want to hear it at this point. I know you had this memorandum with six points. You can submit that if you want to, but in the very same breath, it said, I'm not opening this record for any reason. That tells the defendant, who therefore is like, I'm not going to listen to you. What you have to say doesn't matter. Now, going back just real quick to the communication, you can be the best defense attorney in the world, but if your client doesn't even have at least a limited amount of trust for you and will communicate with you, or you're able to communicate with them, I think that is prejudice. Okay. Thank you, counsel. Good morning, Your Honor. This is Mary Beth Young on behalf of the United States. I'm with my colleague, again, with the suppression issue. What is at issue here, of course, is statements that were made at the DEA office, not at the house where the SWAT team made entry. So it's important to keep focused on that. And what is being argued in terms of the suppression is voluntary disowning because the statements that are used were post-Miranda Baker. And essentially there are two categories of law enforcement conduct that are being claimed to have given rise to coercion. And coercive conduct by law enforcement, of course, is a requirement to find involuntariness. It's not just a matter of some defendant feeling frustrated or panicked. It has to be caused by coercive conduct by law enforcement. That first category of conduct that counsel points to is the conduct during the SWAT entry. And at the outset, it's important to note there are non-factual findings as to what happened during the SWAT entry. There are serious allegations. Those, for the most part, were supported only by the testimony of the defendant at the suppression hearing. Counsel is correct that the two members of law enforcement who were at the suppression hearing were not inside the house during the SWAT entry. There is a reason for that, however, which is that the motion to suppress did not point to the SWAT entry. The motion to suppress argued involuntariness based on the promises of leniency, promises of confidentiality. And the two law enforcement witnesses who were present at the suppression hearing were officers who were at the interview where the statements were made. So they were prepared to discuss those issues. They were not inside the house during the SWAT entry, so naturally the testimony they could provide on that was limited. The court, however, found, and we think recently, that it wasn't necessary to make factual findings on those points because, for several reasons, the SWAT entry would not have rendered the statements in question involuntary. One, different locations. Two, different officers. The SWAT officers were a local SWAT team. None of them participated in the later interview. Third, there had been transportation, fingerprinting, DNA samples, a number of intervening events during that time. And as to timing, just a footnote, that there's been some confusion in the record about the timing of the initial appearance, and the court had a minute entry that suggested the initial appearance was at 11, which was earlier than the time on the waivers. If the court looks at the actual transcript of the initial appearance, which is in the record, at 410, the initial appearance was at 2.38 p.m., so there's no inconsistency. What appears to have happened is what, I think, was Special Agent Eichenloch, who noted that it's not uncommon for them to reserve just a big block of time when they're returning multiple search warrants. Shifting to the second category, promises, as far as coercive conduct, the district court there found that even to the extent there were promises of leniency, those were not coercive, and that it made no finding as to any promise of confidentiality. If there were promises of confidentiality, they were likely broken. That's what the court said. If there were promises, they were likely broken. Sure, because we went defendant-opposed attention, and we put on an agent that noted that he had made statements admitting participation. So yes, if there were promises of confidentiality, they were likely broken, frankly, but there's no finding that there were, and that was completely denied by law enforcement agents. Well, I understand, but if the judge made no finding, then what are we supposed to do? The judge made no finding on whether there were promises of confidentiality. The judge did make a finding that even if there were, there was no evidence that they motivated any statement by the defendant, and that made perfect sense. So then what you're really saying is it doesn't make sense. It was not necessary to make a finding on an issue, and that made perfect sense because there was not one witness at the suppression hearing that testified in support of there were statements made that were motivated by promises of confidentiality. Law enforcement officers said there were no promises of confidentiality, so of course nothing was motivated by any such promise, whereas the defendant said he didn't make any statements. The defendant's position was that yes, these bad things were done, but I never said any of those things, and that remained his position throughout trial. So the district court would have essentially had to make a finding that was contradictory to everyone's testimony at the suppression hearing. Shifting to the substitution issue. The first substitution motion, taking that one first. Can you talk about, honestly, my problem in this case is that second motion to withdraw. Can you talk about that? Understandable. There was no hearing. There was nothing. You just said that's inadequate, right? That's inadequate. We do not claim that that inquiry makes that prong cut in favor of not substituting here. However, that is one of four prongs. As far as an inquiry goes, that was inadequate. However, it's the United States' position, and really something my opponent said alludes to it, that Mr. Collado went on to say, notwithstanding the court's error in how it initially addressed him and whether or not he invited any further comment on that, the record of the sentencing hearing overall went on elsewhere to provide sufficient information that we believe that this court has an adequate record to conclude that there was not good cause for substitution. Notwithstanding that it didn't come in the form of an inquiry that would have been what we would have scripted. But if there's no record about what the state of the relationship was, the communications or lack of communication between the two, how can we possibly do that? While there was not a record developed directly on that issue, Mr. Collado did go ahead and talk to some extent about what his problems were. Counsel was not, quote, making the right objections. And as Your Honor's noted, he was then invited to submit a memo that contained what those objections would have been. He didn't. I think it's a fair point that it wasn't clear that the judge was inviting him to submit that to be considered before the sentence. It was almost more like a proffer. He was offering for him to put that in the record. But at least that offer was made at a time. There's no prejudice requirement, though, is there? I mean, all they have to show is there was a violation, right? They don't have to show that there was ineffectiveness or something, right? This is one of those constitutional violations that's just a violation, right? I think I agree with you, Judge Chalbanian, that there's some type of a prejudice requirement in that. Keep in mind, in the third crime, this is an indigent defendant, so there is no independent right to counsel of choice. As many cases have said, most notably Gonzalez-Lopez, for an indigent defendant, the right that's being protected is ultimately just the right to counsel. And this courts those factors, the four factors, are used both in cases involving indigent defendants and retained counsel. The factors are the same, but the United States would submit that the analysis is not actually exactly the same because under Gonzalez-Lopez, when you're talking about retained counsel, you have a right to counsel of choice, but the right's not absolute. When you're talking about indigent appointed counsel situations, you don't have a right to counsel of choice. You have a right to counsel, and that does mean, under the third crime, that you have a right to counsel with whom you're communicating so that it enables an adequate defence. If that's not the kind of conflict that's an issue for an indigent defendant, then we believe that no violation has been shown. I wanted to ask, I think you said that Mr. Collado had a chance to essentially proffer his objections even though early in the game, the judge, the court said, simply overruled. My sense of the record is he did try to articulate some of his objections, not just to his counsel representing him, but also to matters of his counsel handling the PSR. So he had specific objections about the PSR, and the judge, the court cut him off and said something to the effect, I just want to sentence you. Let's just get on and sentence him, and we'll do that, and we'll go to the court of appeals. So I guess it's unclear to me that he really had a chance to even proffer as much as he would have. What's your response to that? I think that the question of him being able to state independently his objections really collapses with the issue of whether substitution was necessary, because if it wasn't, if the district court had fully heard his reasons and ruled, having listened to your reasons for desiring substitution, I find them inadequate and I deny, and then Mr. Collado said, after his counsel argued the guidelines, I have some thoughts. The court would properly have said, I'm sorry, you'll have an opportunity to advocate, but as to objections to the guidelines, that's for your counsel to handle. I guess I really got the sense from the record that unlike the first motion to withdraw, where the court concluded, I think, that the relationship was not irretrievably broken and communication could be broken down, that here, if you really examine what was happening at this hearing, that one could conclude that that relationship wasn't irretrievably broken and counsel, there should have been counsel, he wasn't given, Mr. Collado wasn't really given a chance to give all of his reasons. Just to be clear, I think certainly this court would not make a conclusion on whether counsel should have been substituted. We would remand it. The right remedy there would be remand, and I think not for resentencing, because this is not a sentencing error, and as we addressed, I believe in our brief, this court's practice in this kind of situation has been to remand for just additional, basically do what the court should have done in the first place. Whether there's really good cause. Exactly, to hear evidence or to hear from the defendant would require bringing the defendant in personally. Here are his reasons that he believed, at the time that substitution was necessary, perhaps take the written reasons he had and then make a finding, which this court would then be in a position to review on a more developed record. I'm sorry, would he then say, I think you're right, you were treatably broken at the time, everything that happened after that shouldn't have happened, so I do have to resentence? Yes, I think that if, were this court inclined to proceed this way, you'd want to style the remand just to avoid it monging back up unnecessarily, so that if the district court concluded substitution was warranted, it would go ahead with the resentencing with new counsel. Unless the court has questions. Thank you. Very briefly, because I only have two minutes here, I just want to address a couple things. I don't think that, as my opponent has said, that if substitution is not necessary in the sentencing, then the whole thing collapses, including his objections to the pre-sentence report. The statement's pretty clear on the record, he had objections to that pre-sentence report. There's two of them. I'm sorry, what do you think the remedy is? I think the remedy in this situation is a remand for resentencing. I do. And I did want to go back and focus on that first notion of withdrawal as well, because there was also discussion about two other attorneys that had been involved. And if you look at that transcript, it really is more dismissive responses by the court. There was one attorney, a fellow named George Chaney, that he wanted. Apparently that's a public defender. I don't practice down there, so I didn't know. But then there was also another private attorney. For that question, for George Chaney, it was, well, your counsel just experienced it more so. For the other one, it was more cut off of, they share office spaces. No wonder he's going to be mad. But we don't hear the question ever, Mr. Collado, do you have the ability, or do you want a new counsel? I think that was raised, and I think it was incumbent upon the court to at least ask the question to get to the bottom of that. And I think that does provide us with a room here, not just for a reversal to make sure that the Mack Isle inquiry is done, but an actual constructive, denominal, effective assistance. I do think that the communication at that time before trial was broken. I do. I think by the way the court acted about, with the Lafler hearing and everything like that, I just don't know how Mr. Collado felt. Even if I would have brought this back up before trial, I think he probably, quite frankly, was right. It wouldn't have gotten him anywhere anyway. If we were to remand the denial of the motion to substitute counsel post-trial, and the district court found there was not good cause for a new counsel to be appointed, would you still argue that there would need to be resentencing? Yes, Your Honor. And that's because of the second board, the objections that have been made so far. Rule 32, even though it does say that attorneys get the opportunity to speak, it also, 32I3B, puts a duty on the district court to rule on all disputed portions of the pre-sentence report, unless the court finds it's unnecessary. In this situation, it wasn't unnecessary because it wouldn't affect the guidelines. We don't know. It was unnecessary because when the court's on words, I'm not going to listen to it. Okay. Thank you, counsel. And Mr. Rader, you noted that you've been handling these cases under the Criminal Justice Act for quite some time, 15, 16, 17 years, I think you said. We appreciate your willingness to take cases on pursuant to that act, and for taking on this particular case. It's a real service to your client and to the system at large. So thank you very much. Thank you, Your Honor. Let me give the duty. Counsel? Yeah, thank you both for your arguments, and the case will be submitted. You may call the next case.